No. 48,366

STATE OF KANSAS, *Appellee*, v. ROY EUGENE AMES, *Appellant.*

(563 P.2d 1034)

Opinion filed April 9, 1977.

*Thomas A. Valentine*, of Sloan, Listrom, Eisenbarth, Sloan and Glassman, Topeka, argued the cause and was on the brief for appellant; and *Roy E. Ames* was on the appellant's brief *pro se*.

*Thomas D. Haney*, assistant district attorney, argued the cause and *Curt T. Schneider*, attorney general, and *Gene M. Olander*, district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, C. J.: This is an appeal by defendant Roy E. Ames from a conviction by jury trial of the offense of unlawful possession of a firearm (K. S. A. 21-4204[1][b]).

On April 2, 1974, a search warrant for a gun and holster at the downstairs apartment of 1616 Polk in Topeka was issued. The appellant's wife lived at this address; the appellant was in the Shawnee County Jail at the time. Officers found a revolver in a holster with the belt wrapped around the holster. Ammunition was in the belt, and live rounds were in the gun. All were seized. On August 28, 1974, an information was filed charging the appellant with the unlawful possession of a firearm with a barrel less than twelve inches long, within five years after conviction for the felony offense of burglary, in the district court of Shawnee County, Kansas. A jury trial was commenced on December 9, 1974. During noon recess on that day, jurors observed the appellant in handcuffs. A mistrial was granted. The second jury trial commenced on February 3, 1975. The state's evidence showed that on September 21, 1973, the appellant and his wife met Mary Lou Potter at Wild Willie's South in Topeka. The appellant pointed out the revolver he wanted and gave Mary the necessary cash. She bought the gun and gave it to the appellant. The evidence showed that subsequent to the purchase, the appellant used the gun for target practice and frequently practiced fast-drawing the gun in front of a mirror. Both the appellant and his wife referred to the gun as his. On February 5, 1975, the jury returned its verdict, finding the appellant guilty as charged. Following a number of post-trial motions which ultimately resulted in the district court's denying the appellant's motion for new trial, the appellant was sentenced under the Habitual Criminal Act on September 30, 1975. This appeal followed.

The appellant's first three points on appeal deal with the admission into evidence of the gun and holster seized under the search warrant. He first contends such admission was error because the affidavit in support of the search warrant was fatally defective in that it was based in part on hearsay and such fact was not disclosed to the issuing magistrate.

The affiant was one Dena Christian. She had been living with the appellant's wife until they each moved to a new address only a few days before she made her sworn statement. In preparing her affidavit at the district attorney's office, Dena was not certain of the address to which the appellant's wife had moved. She consulted the classified section in the newspaper and called the listing she thought the appellant's wife had taken. The landlady

told her that the appellant's wife had rented the downstairs apartment at that address. All the statements in Dena's affidavit are based on her personal observation except the address at which she stated the appellant's wife was residing. The hearsay nature of the latter statement was not disclosed to the issuing magistrate.

In *State v. Hart*, 200 Kan. 153, 434 P. 2d 999, this court, relying on *Aguilar v. Texas*, 378 U. S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, set out the requirements for the valid issuance of a warrant:

". . . [B]efore a search warrant may validly be issued, there must have been placed before the issuing magistrate sufficient facts to enable him to make an intelligent and independent determination that probable cause exists; . . . while an affidavit may be based on hearsay, there must be sufficient affirmative allegations as to the affiant's personal knowledge or his knowledge concerning his informant, or as to the informant's personal knowledge of the things about which the informant spoke, to provide a rational basis upon which the magistrate can make a judicious determination of probable cause." 200 Kan. at 162.

*See State v. Hubbard*, 215 Kan. 42, 523 P. 2d 387.

The point appellant now raises was raised at the suppression hearing before trial. In its ruling on the motion to suppress, the district court stated that if the warrant had been issued on a finding of probable cause, based on material written statements under oath that were later shown to be untrue, items seized should be suppressed. Evidence at the suppression hearing, however, showed the sworn statement was true. Should the items seized be suppressed anyway because hearsay was involved and there was no finding based upon the two-pronged test of *Aguilar*? The district court answered this question in the negative. It reasoned that warrants may be based on hearsay, and where the hearsay statements are true and are of the nature of the statements in this case the evidence seized should not be suppressed. We agree with the district court. The hearsay involved in this case did not affect the magistrate's probable cause determination. Failure to comply with the *Aguilar* requirement does not mandate suppression under the instant facts.

The appellant next contends admitting the holster into evidence was error because the warrant authorized the seizure of only the gun and not the holster.

The search warrant provided in pertinent part:

". . . I find there is probable cause to believe that an offense against the laws of the State of Kansas has been committed and that certain items, to-wit: One

pearl handled white revolver wrapped with tape on handles. Possibly 38 or 45 caliber with barrel less than 12″ in length, in leather holster . . . are contraband or are fruits, instrumentalities, or evidence of such offense. . . .″

The Fourth Amendment to the United States Constitution and *Section Fifteen of the Bill of Rights of the Kansas Constitution* prohibit warrants except those "particularly describing the place to be searched, and the persons or property to be seized." The purpose of this requirement is to prevent general searches and to prevent the seizure of an item at the discretion of the officer. *Stanford v. Texas,* 379 U. S. 476, 13 L. Ed. 2d 431, 85 S. Ct. 506. The test is one of practical accuracy rather than one of technical sufficiency, and absolute precision is not required in identifying the property to be seized. *United States v. Ventresca,* 380 U. S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741; 3 C. Wright, Federal Practice and Procedure, Criminal, Sec. 670 (1969).

In Mascolo, *Specificity Requirements for Warrants under the Fourth Amendment: Defining the Zone of Privacy,* 73 Dick. L. Rev. 1 (1968), it is said:

"The courts prefer searches conducted under the authority of warrants to those conducted without benefit thereof. Therefore, warrants, and their supporting affidavits, are interpreted in a commonsense, rather than a hypertechnical, fashion. To do otherwise would 'tend to discourage police officers from submitting their evidence to a judicial officer before acting.' Because of the courts' preference for warrants, it is presumed, in the absence of a showing of illegality, that search warrants are valid. This presumption of legality also applies to supporting affidavits, as well as to the proper performance by the issuing magistrate of his official duties. Consequently, one who attacks the validity of a search warrant carries the burden of persuasion." *Id.* at 7-8.

In the case at bar, there was clearly no extension of the search involved in seizing the holster, nor, in our opinion, did the officers seize more than was particularly described in the warrant. The warrant meets the constitutional requirement of "particularity."

The appellant next contends that because of the great number of technical irregularities in connection with the execution and return of the warrant, the warrant should have been quashed and the evidence suppressed. Therefore, admission of the holster and pistol into evidence was error. The appellant enumerates the following technical irregularities: (1) the return was unsigned; (2) the holster was not listed as an item seized; (3) the officer gave the gun to the district attorney without prior authority of the magis-

trate in violation of K. S. A. 22-2512; (4) no receipt for the items taken was given to the accused or filed with the magistrate in violation of K. S. A. 22-2512; (5) the date on the return was in error.

K. S. A. 22-2511 provides:

"No search warrant shall be quashed . . . because of technical irregularities not affecting the substantial rights of the accused."

Failure to comply with each of the first four procedural requirements which the appellant lists have been found in various cases not to require suppression of the evidence. *United States v. Hall,* 505 F. 2d 961 (3rd Cir. 1974) (return unsigned); *Cady v. Dombrowski,* 413 U. S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (items seized not listed on return); *State v. Stewart,* 219 Kan. 523, 548 P. 2d 787 (failure to comply with K.S.A. 22-2512); *People v. Canaday,* 49 Ill. 2d 416, 275 N. E. 2d 356 (1971) (failure to give receipt for items seized). The fifth irregularity—an erroneous date on the return—is a purely technical error which we discount out of hand under the facts of this case. We are cited to no cases and have found none involving as many irregularities as the instant case.

In *State v. Stewart,* 219 Kan. 523, 527, 548 P. 2d 787, 792, we said:

"Police officers should comply with the statute [K. S. A. 22-2512] and under certain circumstances their failure to do so might well preclude the admission of seized articles into evidence at the trial. The failure to comply with the statute, however, does not as a matter of law prevent the admission of the seized articles into evidence. . . ."

K.S.A. 22-2511 was adopted verbatim from Ill. Rev. Stat. Ch. 38, Sec. 108-14. Relying on their statute which parallels K. S. A. 22-2511, the Illinois court in *People v. Canaday,* 49 Ill. 2d 416, 275 N. E. 2d 356 (1971) said:

". . . [F]ailure to comply . . . with a statutory direction to furnish an inventory of the seized materials will not *in the absence of prejudice* invalidate an otherwise proper search and seizure." 275 N. E. 2d at 360. (emphasis added)

In the instant case, the irregularities occurred after a valid search and seizure. Hence, they are not constitutionally significant; the ramification of the procedural violations is governed by the rules of procedure.

Federal Rule of Criminal Procedure 41 (d) governs the execu-

tion and return of search warrants. Its requirements are similar to those in Article 25 of the Kansas Code of Criminal Procedure. The Third Circuit in *United States v. Hall*, supra, was faced with determining the proper remedy for failure to adhere to the procedures of Fed. R. Crim. P. 41 (d). Noting the rule did not expressly address remedies which might flow from noncompliance, the court turned to Fed. R. Crim. P. 2 for its interpretive polestar. The language of K. S. A. 22-2103 is identical with Fed. R. Crim. P. 2. We think *Hall's* rationale is persuasive and adopt it.

Article 25 of the Code of Criminal Procedure outlines procedures for the execution of a search warrant, but does not expressly address the remedies, if any, which flow from a failure to adhere to these procedures. We turn to K. S. A. 22-2103 as our guide. K. S. A. 22-2103 expresses values sought to be achieved by the Code of Criminal Procedure. It commands a construction which secures "simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." The manifest intent of the Code is to ensure a just determination of every criminal proceeding.

Applying these guidelines to the issue before us, we do not believe it was intended that every violation of procedures in the Code, however insignificant or inconsequential, should give rise to the suppression remedy. Were that the intent, we think the Code would have specifically so provided. But we do not believe the Legislature would enact the Code of Criminal Procedure expressly requiring certain actions on the part of the state, and not also intend some remedy to flow from certain violations of the required procedures. We therefore conclude that a warrant should be quashed and evidence suppressed by the district court only when the defendant demonstrates prejudice from a technical irregularity in violation of the rules of procedure governing the execution of search warrants.

The foregoing interpretation furthers the governing intent of the Code—a just determination of every criminal proceeding—and prevents the wholesale opportunity for abuse. Suppression remains a viable remedy where a sufficient showing of prejudice is made—*i.e.*, "prejudice in the sense that it offends concepts of fundamental fairness or due process." *United States v. Hall,* supra, at 964.

While we do not condone the procedural violations by law

enforcement officers in the instant case, we find the defendant has not demonstrated these technical irregularities resulted in substantial prejudice.

For the reasons as set forth in the foregoing portion of the opinion, we hold the district court did not err in its ruling on the suppression motion and its admission of the pistol and holster into evidence.

The appellant next contends the district court erred in denying his motion for discharge at the close of the state's evidence, and his motion for a directed verdict after the defense had rested its case.

A motion for discharge, a motion for directed verdict and a motion for judgment of acquittal all go to the sufficiency of the evidence to support a conviction. *See State v. Gustin,* 212 Kan. 475, 510 P.2d 1290; 23A C.J.S. *Criminal Law,* Sec. 1145(3)(a)(1961). K.S.A. 22-3419 governs motions for judgment of acquittal. The standards for judging the sufficiency of evidence in ruling on a motion for judgment of acquittal were set out in *State v. Gustin,* supra. In the instant case, the district court did not err in this respect. *See State v. Anderson,* 211 Kan. 148, 505 P. 2d 691.

The appellant next contends the state failed to prove beyond a reasonable doubt the allegations set forth in the information. This point really goes to the sufficiency of the evidence. On appellate review, the question is not whether the evidence establishes guilt beyond a reasonable doubt, but whether the evidence was sufficient to form the basis for a reasonable inference of guilt. *State v. Wilson,* 220 Kan. 341, 552 P. 2d 931. In making this determination, the evidence is viewed in the light most favorable to the state. *State v. Motor,* 220 Kan. 99, 551 P. 2d 783.

Viewed in the light most favorable to the state, the evidence shows that on September 21, 1973, the appellant and his wife went to Wild Willie's South in Topeka, and looked at guns. The appellant had the clerk lay a gun back for him and left. The appellant called his aunt, Mary Lou Potter, in Holton, and asked that she come to Topeka and buy him a gun. Mary came to Topeka and met the appellant and his wife at Wild Willie's South. The appellant pointed out the gun he wanted and gave Mary the necessary cash. She bought the gun and gave it to him. After purchasing the gun, all went back to Holton in Jackson

County—the appellant, his wife and Mary were in the car with the gun. That same day, the appellant and his wife purchased a holster for the gun at Woolco in Topeka. The belt and holster were too big for the appellant's wife, but fit the appellant. In January and February of 1974, the appellant and his wife lived in Topeka; Dena Christian lived with them. Dena observed the appellant practicing fast-drawing the gun in front of the mirror almost every day. The sights on the gun had been filed down, apparently to facilitate fast-drawing. Dena testified she never saw the appellant's wife handling the gun except when they moved. Dena testified the appellant referred to the gun as his, as did his wife. When Dena and the appellant's wife were living together while the appellant was in jail, Dena never saw his wife handle the gun except when they moved.

The evidence of events after September 21, 1973, was relevant to show the requisite possession of the firearm the appellant exercised on the day it was purchased—*i.e.*, a willful or knowing possession of a firearm with intent to control the use and management thereof. *State v. Neal*, 215 Kan. 737, 529 P. 2d 114. We have no hesitancy in finding the evidence was sufficient to form the basis for a reasonable inference of guilt.

The appellant next contends the district court erred in denying his *pro se* motion for appointment of a judge *pro· tem.*

K. S. A. 20-305 provides that a judge *pro tem* of the district court may be selected when the judge is disqualified to sit. (K. S. A. 20-305 was repealed January 10, 1977 [1976 Kan. Sess. Laws, Ch. 146, Sec. 48].) A judge is disqualified to sit when he is shown to be prejudiced against one of the parties. *In re Peyton*, 12 Kan. 398, * 311.

K.S.A. 20-311d provides:

"(*a*) If either party to any action in a district court files an affidavit alleging any of the grounds specified in subsection (*b*) the administrative judge shall at once transfer the action to another division of the court. . . .

"(*b*) Grounds which may be alleged as provided in subsection (*a*) for change of judge are: . . .

"(5) That the party filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice, or interest of the judge he cannot obtain a fair and impartial trial. Such affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists."

K.S.A. 20-311f provides in pertinent part:

". . . [A] party shall have seven (7) days after pretrial, or after receipt of

written notice of the judge to which the case is assigned or before whom the case is to be heard, whichever is later, in which the affidavit may be filed."

On January 30, 1975, the appellant filed a *pro se* motion for appointment of a judge *pro tem* pursuant to K. S. A. 20-305. On January 31, 1975, a motion by the appellant through his appointed counsel was filed pursuant to K. S. A. 20-311d for the disqualification of The Honorable Adrian J. Allen, judge of the fourth division of the district court of Shawnee County before whom the case was to be tried. The administrative judge transferred the latter motion to Judge William R. Carpenter of the first division for hearing and determination. On February 3, 1975, the morning scheduled for the start of the appellant's trial, Judge Carpenter heard arguments on the motion for disqualification of Judge Allen and denied the motion because it was untimely filed under K. S. A. 20-311f. Judge Carpenter filed his written decision on the motion on the afternoon of February 3, 1975; thereafter, Judge Allen denied the appellant's *pro se* motion for judge *pro tem* and the trial commenced. Judge Allen stated:

"Let the record show that the minutes reflect that Judge Carpenter heard an application for disqualification of myself today to hear this case which was denied, and accordingly the Court feels that the motion for a *pro tem* should also be denied."

The appellant concedes Judge Carpenter properly overruled the motion for disqualification because it was untimely filed, but argues the time limits in K. S. A. 20-311f cannot apply to a motion for a judge *pro tem* under K.S.A. 20-305. Consequently, it was error for Judge Allen to rely on Judge Carpenter's ruling on procedural grounds. The appellant argues his *pro se* motion should have been determined on the merits by a judge other than Judge Allen. The appellant's point is not well taken.

A party who shows a judge is prejudiced against him has a right to have his case tried before some other judge—either a judge in some other division or district, or a judge *pro tem*. *In re Peyton,* supra. The first step in getting a new judge, *pro tem* or otherwise, is to show prejudice. K. S. A. 20-311d sets out the procedures for this determination. Only after a finding of prejudice under the procedures of K. S. A. 20-311d would the provisions for appointment of a judge *pro tem* under K. S. A. 20-305 come into play. To allow a movant for disqualification of a judge barred by the time limitations of K. S. A. 20-311f to proceed under K. S. A. 20-305

regardless of time, would circumvent the procedures for disqualification of a judge.

K. S. A. 20-311f was a procedural bar to both the motion for disqualification and the *pro se* motion for appointment of a judge *pro tem.* The district court properly did not rule on the merits of either motion; neither will this court reach the merits of either motion on appeal.

The appellant's next two points will be considered together. The appellant contends he was denied the right to have compulsory process for obtaining witnesses in his favor in contravention of the Sixth Amendment of the United States Constitution and Section Ten of the Bill of Rights of the Kansas Constitution when the district court ruled his court-appointed attorney had the sole power to decide who would testify in the appellant's behalf. The appellant further contends this denial of compulsory process together with the court-sanctioned refusal of his attorney to present the appellant's desired defenses constituted violations of rights that are necessarily *implied* from the Sixth Amendment and Section Ten of the Kansas Bill of Rights—*i.e.*, the right to assist in his own defense.

It is quite clear from the record that the appellant and his appointed counsel disagreed from the outset as to what witnesses should be called and how the defense should be presented. The appellant wanted to go into areas in his defense strategy that his counsel thought were collateral and irrelevant. The appellant filed a *pro se* motion directing that some fourteen witnesses be subpoenaed. The appellant apparently wanted several of these witnesses to present his theory of the defense. The judge ruled that while the appellant had the right to compulsory process, the ultimate decision on which witnesses would be subpoenaed was for his counsel as were other matters of trial strategy. Appellant's counsel talked to the witnesses and knew what they would say; he called only those witnesses which, in his opinion, were pertinent to the defense.

There was also some dispute as to the degree of appellant's participation in his defense. The appellant was recognized as co-counsel at his arraignment. During the course of the proceedings below, he filed a plethora of *pro se* motions. He was allowed to argue some of these *pro se* motions at both pretrial and post-trial hearings. At trial, the appellant wanted not only to

direct the course of his defense strategy, but also wished to take part in jury selection and wanted the right to have certain questions asked of witnesses. The appellant was not allowed to so participate at the trial. Conduct of the trial was entirely under the control of appointed counsel, although he did listen to the appellant's suggestions.

The appellant repeatedly stated he wanted appointed counsel. He also wanted the right to conduct his own defense. On October 10, 1974, the appellant's first court-appointed counsel was allowed to withdraw, and another attorney was appointed. It is not clear from the record why the appellant wanted the change. The court allowed the change because both counsel and the appellant agreed to it. When it became apparent that his second appointed counsel would not call all the witnesses the appellant desired or present his theory of the defense, the appellant asked the court to dismiss him and appoint a third counsel. The court advised the appellant he had the right to defend himself or to have appointed counsel. The appellant wanted counsel, and the court refused to make another change.

In *Faretta v. California,* 422 U. S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, the United States Supreme Court held that the Sixth Amendment, as made applicable to the states by the Fourteenth Amendment, guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation in that he may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. The opinion states:

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must . . . be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 422 U. S. 819-20.

The appellant relies on *Faretta* for the proposition that he had a constitutional right to dictate what witnesses would be called and to participate in his own defense. We disagree.

Prior to *Faretta,* federal courts held that a party had a right to represent himself or to be represented by counsel, but did not have the right to hybrid representation. *United States v. Hill,* 526 F. 2d 1019, 1024 (10th Cir. 1975). *Faretta* ratified a consensus

within the federal judiciary favoring a constitutional right to *pro se* representation. *United States v. Swinton,* 400 F. Supp. 805 (S.D.N.Y. 1975). *Faretta* did not alter the established rules concerning hybrid representation. *United States v. Hill,* supra. *See United States v. Bennett,* 539 F. 2d 45 (10th Cir. 1976); *United States v. Williams,* 534 F. 2d 119, 123 (8th Cir. 1976). An indigent accused has a right to either appointed counsel or *pro se* representation, but both rights cannot simultaneously be asserted. *See United States v. Williams,* supra; *United States v. Swinton,* supra; *People v. Morris,* 12 Mich. App. 411, 163 N. W. 2d 16 (1968). A defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel. *See Rogers v. United States,* 325 F. 2d 485, 488 (10th Cir. 1963); *People v. LaMarr,* 1 Mich. App. 389, 136 N. W. 2d 708 (1965).

The *Faretta* decision recognized that the defendant could either represent himself or be represented by counsel:

". . . It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. (citations omitted) This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." 422 U. S. at 820-21.

There is no question appellant wanted appointed counsel, but he did not want to be bound by the decisions of counsel. Our holding in *Winter v. State,* 210 Kan. 597, 502 P. 2d 733, is apropos:

"In the control and direction of a criminal case certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are: (1) what plea to enter; (2) whether to waive jury trial; and (3) whether to testify in his own behalf." (Syl. 1)

"In the conduct of the defense of a criminal case the technical and professional decisions, which require trained professional skill and judgment, must rest with the lawyer. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client." (Syl. 2)

Although the appellant was recognized as co-counsel, his right

to participate with counsel in the conduct of his defense was still within the sound discretion of the district court. *United States v. Swinton,* supra at 806; *Fowler v. State,* 512 P. 2d 238 (Okla. Crim. App. 1973); *see State v. Kelly,* 210 Kan. 192, 499 P. 2d 1040. We would also note that an indigent criminal defendant may not demand a different appointed counsel except for good cause, and it is within the sound discretion of the district court to decide whether the dissatisfaction of an indigent accused with his court-appointed counsel warrants discharge of that counsel and appointment of new counsel. *State v. Banks,* 216 Kan. 390, 532 P. 2d 1058.

We hold that, under the facts of the instant case, the appellant's right to compulsory process was not abridged, and the district court did not abuse its discretion in limiting the appellant's participation in his defense or in denying his request for change of appointed counsel.

The appellant next contends the district court erred in denying his motion for an order designating the Menninger Foundation to conduct a psychiatric examination of him in order to aid the court in determining whether he was, prior to the rendition of the judgment and during his trial, incompetent to stand trial as defined in K. S. A. 22-3301(1)(*b*).

Shortly after trial, the appellant's court-appointed counsel was allowed to withdraw and yet another counsel was appointed as a result of allegations of ineffective assistance of counsel in the appellant's *pro se* motion for a new trial. Two months after trial, the new appointed counsel filed a motion to determine the appellant's competency to stand trial. A psychiatrist with the Shawnee County Court Clinic was directed to examine the appellant concerning his competency. At the hearing on the motion on June 3, 1975, the psychiatrist testified his examination was inconclusive. After he testified, the appellant went into a tirade and was twice found in contempt. The psychiatrist took the stand again and testified concerning the appellant's conduct he had just observed. Based primarily upon this testimony, the district court found the appellant was unable to understand the nature of the proceedings against him or to make or assist in making his defense. The court ordered him committed to the state security hospital at Larned for a period not to exceed six months. On July 1, 1975, Larned submitted a report to the district court; a hearing

was held on July 25, 1975, and, based on the Larned report, the court found the appellant was competent to stand trial, and ordered suspended proceedings on motions, including motions for new trial, be resumed. Thereafter, appellant's counsel filed a motion requesting the court to designate the Menninger Foundation to conduct a further psychiatric examination of the appellant to determine whether he was competent at the time of trial. The district court heard arguments on the motion, took it under advisement and, on August 25, 1975, denied it.

The district court's ruling appears to have been based on doctor's reports and upon the court's own observation of the appellant during trial and at numerous other court appearances. The court had before it psychiatric evaluations of the appellant made two and a half years before, six months before and five months after the trial, all of which indicated the appellant was competent to stand trial. The first report by the Shawnee County Court Clinic psychiatrist, filed some three months after trial, was inconclusive. Only the psychiatrist's report based entirely on his observations at the hearing on June 3, 1975, indicated the appellant was incompetent to stand trial. The district court noted that the appellant's conduct had been observed at various stages in pretrial and trial proceedings by two public defenders, by various members of the district attorney's office and by several judges, none of whom questioned his competency based upon personal observation. We do not find the district court abused its discretion in denying the motion for a further psychiatric examination by the Menninger Foundation or in finding the appellant was competent to stand trial at the time of trial. *See Johnson v. State,* 208 Kan. 862, Syl. 1, 494 P. 2d 1078; *State v. Ridge,* 208 Kan. 236, Syl. 3, 491 P. 2d 900; *State v. Kelly,* 192 Kan. 641, 391 P.2d 123.

The appellant next contends the district court erred in sentencing him pursuant to the Habitual Criminal Act (K. S. A. 21-4504). The appellant argues the judgment of conviction relied upon by the state in invoking the statute should have been presumed void because the journal entry was ambiguous as to whether counsel was present at the time of sentencing, and in view of the appellant's testimony he had no counsel at the time of sentencing.

The district court found that counsel was present at sentencing

and that the Florida conviction could properly be used for purposes of the Habitual Criminal Act. We have no dispute with this finding. The Florida journal entry appears in the record and from our reading it is not ambiguous. It indicates counsel was present at the time of sentencing. The district court apparently did not believe the appellant's testimony that no counsel was present. It is not the function of the Supreme Court to reweigh the evidence or pass on the credibility of testimony. *State v. Duke,* 205 Kan. 37, 468 P. 2d 132. The district court did not err in invoking the Habitual Criminal Act pursuant to K.S.A. 21-4504.

The appellant raised other points which do not merit discussion. We have carefully considered each and find no error. Points fifteen through nineteen in the appellant's statement of points are considered abandoned, having been neither briefed nor argued on appeal. *State v. Piland,* 217 Kan. 689, 538 P. 2d 666.

The judgment is affirmed.